1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   D.A., a Minor, by and through his          No.  2:11-cv-01174-TLN-KJN
     Guardian Ad Litem, LATISHA ADAMS,
12
                Plaintiff,
13                                               **OPINION**
            v.
14
     FAIRFIELD-SUISUN UNIFIED
15   SCHOOL DISTRICT and VACAVILLE
     UNIFIED SCHOOL DISTRICT, Local
16   Educational Agencies, CALIFORNIA
     DEPARTMENT OF EDUCATION, A
17   State Educational Agency,

18              Defendants.

19

20          Latisha Adams ("Plaintiff") has sued the Vacaville Unified School District

21   ("Vacaville") and Fairfield-Suisun Unified School District ("Fairfield"), on behalf of her minor

22   son, D.A. ("Student"), a child with special educational needs.  Plaintiff alleges violations of the

23   Individuals with Disabilities Education Act, 20 U.S.C. § 1401, et seq. ("IDEA") in connection

24   with Defendants' attempts to provide Student with a free and appropriate public education.

25          Plaintiff filed the administrative matter underlying the instant case against

26   Defendants on August 5, 2010.  The administrative matter was filed with the State of California,

27   Office of Administrative Hearings ("OAH") and presided over by Administrative Law Judge

28   Garry A. Geren ("ALJ").  The hearings were held on the following dates in 2010: November

                                             1

16−18, 29 and 30; and December 1−2 and 15−17, in Vacaville, California.  Additionally, hearings were held telephonically on December 20, 2010, and January 3, 2011.  The ALJ concluded that although Student is confronted with learning challenges, the educational programs at both Fairfield and Vacaville were reasonably calculated to provide a free and appropriate public education ("FAPE") and thus denied Plaintiff's request for compensatory education at STAR Academy.

Plaintiff appeals the ALJ's decision, alleging that Fairfield (1) failed to assess Student in all suspected areas of disability; (2) did not offer a requested audiological examination for an auditory processing disorder; (3) did not complete Student's annual IEP in October 2008; (4) did not timely conduct IEP meetings in follow up to the October 2008 IEP meeting; and (5) improperly held an IEP meeting without Plaintiff.  Plaintiff further alleges that these procedural violations deprived Student of a FAPE.  (Pl.'s Opening Br., ECF No. 54 at 10−14.)  In addition, Plaintiff contends that Vacaville failed to address Student's needs and thus failed to provide a FAPE because it did not: (1) offer services that allowed Student to make progress in reading; (2) offer services that addressed his processing disorder; and (3) consider a change in Student's program after Student failed to progress.[1]  (ECF No. 54 at 21−29.)  For the reasons set forth below, this Court affirms the ALJ's decision.  Further, this Court affirms the ALJ's finding that Plaintiff has not met the burden of establishing that Student's placement at STAR Academy is warranted as compensatory education.[2]

## I.      APPLICABLE LAW

The IDEA requires that all states receiving federal funds for education must

---

[1]      In addition to Plaintiff's trial brief, she has submitted a request for this Court to take judicial notice of a decision issued by the Office of Administrative Hearings in OAH Case Number N2008030045, pursuant to Federal Rule of Evidence 201.  (ECF No. 58.)  Defendant opposes this request contending that Plaintiff failed to supply this Court with necessary information to establish that the decision in OAH Case Number N2008030045 is "not subject to reasonable dispute" and to establish that the decision has a "direct relation" to the matters at issue.  (ECF No. 60.)  The Court agrees with Defendants.  The decision in Case Number N2008030045 involves different parties, facts and issues.  Thus, the Court denies Plaintiff's request.  *See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("Generally, we will not consider facts outside the record developed before the district court.  However, we may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

[2]      This Court decided the matter without oral argument pursuant to Eastern District of California Local Rule 230(g).  (*See* Minute Order, ECF No. 63.)

provide disabled school children with a FAPE.  20 U.S.C. § 1412(a)(1)(A).  The FAPE, consisting of special education and related services provided at no cost to the child's parent or guardian, must meet state educational standards and be tailored to the child's unique needs through development of an IEP.  20 U.S.C. § 1401(9).  The IEP is a written statement for each child that is developed and revised each year by a team comprised of the child's parents, teachers and other specialists.  20 U.S.C. § 1401(14); § 1414(d)(1)(B).  Although the IDEA does not require school districts to provide special education students with the best education available, or provide instruction services that maximize a student's abilities, the IEP must be reasonably calculated to provide the student with some educational benefit.  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 198–200 (1982).  School districts are required to provide a "basic floor of opportunity" and make available on an individualized basis such specialized instructional and related services necessary to provide the requisite educational benefit.  *Id.* at 201.

Parents who believe that a public school system is not providing a FAPE may unilaterally remove their disabled child from the public school, place him or her in another educational institution, and seek tuition reimbursement for the cost of the alternate placement.  20 U.S.C. § 1412(a)(10)(C); *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 374 (1985).  Parents are entitled to reimbursement, however, only if the court concludes both that the public placement violated IDEA and the private school placement arranged by the parents was proper under the Act.  *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).  Even then, the Court retains discretion to reduce a reimbursement award if the equities so warrant.  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 246−47 (2009).  Costs incurred by parents in such alternative placements may also be reduced or denied if parents fail to provide timely and sufficient notice of the placement to the school district.  *Id.* at 247.  Parents must provide notice of the parents' actual intent to place the student elsewhere either at the most recent IEP team meeting attended by the parents before removing their child from public school, or in writing at least ten business days in advance of the placement.  20 U.S.C. § 1412(a)(10)(C)(1)(bb); 34 C.F.R. § 300.148(d).  Reimbursement demands may also be reduced or denied upon a judicial finding of

1    unreasonableness with respect to placement actions taken by parents.  34 C.F.R. § 300.148(d).

2    Indeed, in fashioning discretionary equitable relief under the IDEA, the court must "consider all

3    relevant factors."  *Florence County*, 510 U.S. at 16.

4           An IEP is evaluated in light of the information available to a district at the time it

5    was developed; it is not judged in hindsight.  *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th

6    Cir. 1999); *see also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) ("An

7    IEP is a snapshot, not a retrospective.").   The IEP must be evaluated in terms of what was

8    objectively reasonable when it was developed.  *See Roland M*, 910 F.2d at 992.  "Actual

9    educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE.  But to

10   impose the inverse of this rule−that a lack of progress necessarily betokens an IEP's inadequacy−

11   would contradict the fundamental concept that '[a]n IEP is a snapshot, not a retrospective.'"

12   *Lessard v. Wilton Lyndeborough Coop. School Dist.*, 518 F.3d 18, 29 (1st Cir. 2008).  Thus, to

13   determine whether Fairfield and Vacaville developed adequate plans to offer Student a FAPE, the

14   Court must consider the circumstances surrounding the formulation of the proposed plans.

15         **II.      FACTUAL BACKGROUND[3]**

16              **A.  <u>General Education Background</u>[4]**

17           Student is a fifteen-year-old boy.  He resided in Fairfield until March 2008, at

18   which time he moved to Vacaville, where he presently resides.  Student was first found eligible

19   for special education and related services in preschool at the age of three (2001−2002 school

20   year).  For the 2002−2003 school year, Student attended a preschool special day class.  Fairfield

21   conducted follow-up speech/language, academic, and psycho-educational assessments.  In May

22   2003, Fairfield determined Student was no longer eligible to receive special education because he

23   had caught up to grade level.  Student returned to a general education kindergarten class for the

24   following school year.  Student started kindergarten during the 2003−2004 school year.

25   Sometime after the first trimester, Student's family relocated within the Vallejo Unified School

26   _____

[3]        The following information pertaining to the factual background of this case was taken from the ALJ's
27   Decision dated February 2, 2011 and labeled Administrative Record ("AR") 2010080262 at 267−303.  Neither of the
     parties has disputed the facts alleged herein.
     [4]        This law suit concerns Student's education spanning from Fall 2008 through Spring 2010.  This General
28   Education Background is provided for context.

4

1  District (Vallejo).  Vallejo determined Student to be ineligible to receive special education
2  services.

3       During the 2004−2005 school year, Student's first grade year, he returned to
4  Fairfield.  In October 2004, Student's teacher became concerned that his language, fine motor,
5  social skills, and his academics were below grade level.  She convened a Student Study Team
6  meeting and began providing Student with interventions in math and reading/language arts.  At
7  the end of the school year, she recommended he repeat the first grade, which he did during the
8  2005−2006 school year.  Student then completed that year and was passed to the second grade.

9       In second grade, during the 2006−2007 school year, Student was again referred for
10  a special-education assessment because his teacher noted delays in his reading, writing, and
11  writing conventions.  Fairfield conducted speech/language and psycho-educational assessments
12  between November 2006 and January 2007.  An individualized educational program (IEP)
13  meeting was held on January 17, 2007.  During this meeting, the IEP team concluded that Student
14  was eligible to receive special education services and support under the Specific Learning
15  Disability (SLD) criterion.  The team then developed Student's IEP, and Plaintiff subsequently
16  consented to it.  The IEP contained a single goal in the area of reading for Student to "work on
17  sight words and simple blends."  The IEP noted that Student is "stronger in the area of reading
18  comprehension than [he is] in reading words in isolation."  The IEP provided Student with
19  specialized instruction in the resource specialist program (RSP) class for 30 minutes per day, five
20  times per week.

21       For Student's third grade year, the 2007−2008 school year, Student was enrolled in
22  a general education classroom comprised of twenty students.  Student passed the third grade;
23  however, testimony established that when compared to later years, the language used in third
24  grade classrooms was relatively simplistic and concrete, with very few abstract ideas being
25  discussed.  Third grade students were heavily guided by teachers throughout their days; the
26  development of organizational skills was not emphasized until later in elementary school, starting
27  with the fourth grade.

28

## B. Fourth Grade Year (2008−2009 School Year)

Student began his fourth grade year in a general education classroom at Fairfield's Amy Blanc Elementary School.  About one month into the school year, he transferred to Fairfield's Rolling Hills Elementary School where he received instruction in two general educational classrooms, from two different teachers.  Each classroom consisted of about 34 students.  Student had one teacher for homeroom, science, and math; Student had another teacher for social studies, reading, writing, and written language conventions.  (*See* Hr'g Tr. 114:25−115:25, Dec.16, 2010.)

Student began the school year receiving 30 minutes per day for four days per week of services in the resource specialist program ("RSP") under an IEP created by Fairfield in his third grade year.  (AR 862−870.)  This IEP, created in November 2007, had one goal: "By 11/01/08, when given a third grade passage, [Student] will fluently read at a rate of 90 correct words per minute with 75% accuracy in 3 trials as measured by reading records/teacher charted data." (AR 865.)  The IEP included a number of accommodations, supports, and supplementary aids and services for implementation in the RSP and general education classrooms.  (AR 866.)

Student's special education teacher, Jennifer Killam, scheduled the first IEP team meeting for Student's fourth grade year.  Prior to the meeting, she worked with Student's general education teachers, Ms. Chancellor and Ms. Ernig, to collect data about Student's then current levels of performance.  All three teachers conducted informal assessments of Student.  Prior to the meeting, Ms. Killam drafted a proposed IEP, which included goals in the areas of reading fluency, number sense, and multiplication.  Ms. Killam consulted with Ms. Chancellor and Ms. Emig who believed the goals to be appropriate.  Ms. Killam provided Plaintiff with a copy of the proposed IEP a few days before the meeting for her review and consideration so that Plaintiff could be better informed and thus be a more meaningful participant in the meeting.

Plaintiff and Ms. Geller (Plaintiff's educational advocate) met for the first time on the morning before the meeting started.  Plaintiff and Ms. Geller had previously spoken on the telephone and Plaintiff had provided Ms. Geller with some of Student's educationally related paperwork.  However, Ms. Geller had a limited understanding of Student's educational history at

6

the time of this IEP meeting.

### i.   October 24, 2008 IEP Meeting

Attendees at the meeting were Plaintiff, Ms. Geller, the school principal, Ms. Castro (program coordinator), and the three teachers.  At the meeting, Plaintiff told the team she was concerned that Student's behavior interfered with aspects of his life both in and out of school.  Plaintiff requested the IEP to be amended to provide more behavioral support.  She then informed the team that based on Student's recent eye examination, she believed his poor vision might have an adverse effect on his academic studies.  Plaintiff's observation about Student's behavior was shared by his teachers who reported Student's behavior impeded his functioning in the classroom.  For example, Student could not stay on task; took a long time to gather materials from his back pack and desk; and he needed many teacher prompts to complete tasks, including activities he had done before.  Ms. Geller expressed concern about Student's reading abilities.  In response to these concerns, the team added two additional goals, one in "on task" behavior and the other in reading comprehension.

During the meeting a disagreement arose between Ms. Geller and Ms. Castro regarding Ms. Geller's request for an audiological assessment.  Ms. Geller opined that Student had an auditory processing disorder ("APD") and demanded that an audiological assessment be completed.  Ms. Castro stated that a school psychologist was the appropriate assessor to diagnose an APD and thus refused to offer an audiologist to conduct the assessment.[5]

After the meeting, Ms. Killam sent Plaintiff a "clean copy" of the revised proposed IEP that contained the newly drafted goals that were added at the meeting.  To implement the goals, Fairfield offered to provide Student with 120 minutes per day in the Resource Specialist Program (RSP).  His time in the RSP was to be divided into 30 minutes for math; 30 minutes for writing; and 60 minutes for reading.  This proposed IEP was consistent with Ms. Geller's request for Student to receive one hour per day of reading intervention.  In addition, Fairfield sent Plaintiff a proposed assessment plan dated October 24, 2008, in which Fairfield proposed three

---

[5]     Ms. Geller was correct in her statement that an APD is a diagnoses made by an audiologist and not by a school psychologist.  However, Fairfield timely rectified this error and offered the requested testing in a subsequent IEP.

assessments: Language/Speech/Communication; General Ability; and Audiology.  The

assessment plan offered an audiologist to conduct an "Audiological Assessment" of Student, just

as Ms. Geller requested.  However, Plaintiff, acting on the advice of Ms. Geller, refused to

consent to the proposed IEP.  Instead, Plaintiff requested to meet again after Student completed

his scheduled eye examination.

### ii.  March 19, 2009 IEP Meeting

Attendees included Plaintiff, Ms. Geller, Ms. Castro, Ms. Emig, Ms. Killam, Ms.

Chancellor, and Ms. Potolone, the school principal.  Student's teachers reported on Student's

progress and provided more information about Student's baselines in response to Ms. Geller's

inquiry raised at the prior IEP team meeting.  Team members proposed goals in the following

areas: reading; reading fluency; reading comprehension; paragraph writing; number sense; and

organization.  The district administrator proposed that Student receive 120 minutes per day, five

days per week for a total of 600 minutes of specialized instruction in the RSP.  Under this

proposal Student would receive daily RSP support for 30 minutes in the areas of math, written

language, reading, and organization.  This proposed IEP would have provided approximately five

times more services than Student received under his then existing 2007 IEP.  However, Plaintiff

refused to consent to the implementation of the proposed IEP on the advice of Ms. Geller.

### iii.  May 22, 2009 IEP Meeting

At the conclusion of the March 2009 IEP team meeting, Ms. Killam discussed

future meeting times with Plaintiff and Ms. Geller.  However, none of the several dates Ms.

Killam proposed were mutually agreeable to Ms. Geller or Plaintiff.  Plaintiff had limited

availability during all of spring 2009.  Ultimately, Ms. Killam set Student's IEP team meeting for

May 22, 2009.  Ms. Killam provided notice to Plaintiff well in advance of the meeting date and

sent a draft of the proposed IEP for Plaintiff's review prior to the meeting.  Plaintiff attempted to

cancel the meeting approximately one week earlier because she had a final examination in a class

she was taking.  The meeting notes indicate Plaintiff was sent a letter on May 15, 2009, stating

that the district declined to reschedule, that Plaintiff had a right to send a representative in her

place, and that implementation of the IEP would not go forward without her consent.

The meeting was attended by a district administrator, the school principal, a program coordinator, Ms. Killam, Ms. Chancelor, Ms. Emig, an occupational therapist, and the facilitator.  Neither Plaintiff nor Ms. Geller attended this IEP team meeting.  The Fairfield members of the team reviewed the findings from a recently completed occupational therapy assessment (sometime before this meeting Plaintiff provided consent for this assessment to be conducted) and proposed to provide Student with occupational therapy services.  Fairfield proposed to increase the sum of his special education and related services from 600 minutes per week to 750 minutes per week, along with providing the same accommodations offered in the proposed October and May IEPs.  Fairfield proposed six goals in the following areas: reading fluency; reading comprehension; paragraph writing; number sense; "on task" behavior; and organization.  The proposed IEP was modified to reflect these changes, and Fairfield mailed a copy of it to Plaintiff for her review and comment.

Plaintiff presumably received this proposed IEP because she testified that sometime in May she received a large "packet" from Fairfield.  (Hr'g Tr. 203:9−13, Dec. 2, 2010.)  However, Plaintiff did not review the packet because she had already arranged to move from Fairfield to Vacaville.  Plaintiff did not attempt to notify Fairfield of Student's impending departure or of her failure to review the latest proposed IEP.  Less than two weeks after this IEP team meeting was held, the school year ended.

### C.  Fifth Grade Year (2009−2010 School Year)

On approximately August 5, 2009, Student moved to Vacaville, and thus Vacaville was obligated to implement services comparable to Student's last agreed upon and implemented IEP.  However, because Plaintiff refused to consent to any of Fairfield's proposed IEPs, Student's last agreed upon IEP remained the November 2007 IEP.  In the eighteen months or so that followed Student's enrollment, Vacaville convened eleven IEP team meetings as discussed below.

#### i.   August 17, 2009 IEP Meeting

Vacaville convened an initial IEP team meeting within days of Student's enrollment.  The purpose of this initial IEP team meeting was so that Vacaville personnel could

familiarize themselves with Student to better plan for his annual IEP.  The meeting was attended by Plaintiff, Ms. Geller, a school psychologist, a program director, general education teachers, a special education teacher, a program specialist, a behavior specialist, and a speech and language therapist.  Student's then current levels of performance and his unique needs were discussed in detail, and are memorialized in the meeting notes:

> Student's general education teacher gave all of her students a fourth grade math diagnostic test to determine how much of their fourth grade math material they had retained.  She estimated Student performed at a 3.7 grade level; however, Student presented as being particularly weak in math facts.  Student read at a second grade level and he "wrote a lot less" than the other students did during the 45 minute test.  He appeared to have phonics skills, but was unable to appropriately spell. He had difficulty with the physical task of writing.

> Mother reported that Student "used to get in a lot of trouble for making inappropriate sounds and noises" in class.  Ms. Geller expressed she personally knew Student's RSP teacher, Jackie Jones, and was aware she was trained in Lindamood-Bell teaching techniques. Ms. Geller thought a Lindamood-Bell-styled instruction might help with Student's "auditory processing issues."  Ms. Geller indicated that she would be making a request for an audiological assessment sometime in the future.

> Before the meeting adjourned, the educational members of the team agreed to look at Student's goals from Faifield; collect information from teachers; have the RSP teacher conduct informal assessments; consider any assessment requests; and reconvene the meeting on August 31, 2009.  Lastly, in an effort to determine Student's unique needs, the educational members of the team requested consent from Mother to assess Student in the areas of academic achievement; language and communication; and occupational therapy.  Consent was not given at that time.

AR at 278.

### ii.  August 31, 2009 IEP Meeting

Attendees included Plaintiff, Ms. Geller, the general education teacher, the program specialist, a school psychologist, a behavior specialist, an occupational therapist, a speech therapist, a resource specialist, and the school principal.  During the meeting, Student's general education teacher, Carolyn Thomas, noted Student reversed letters and numbers and performed at a low level in the area of math facts.  Student's reading proficiency tested at a second grade level, but in actuality Ms. Thomas believed it might be lower.  She reported Student

10

needed repeated prompting for everything he was asked to do, including simple things such as picking up his pencil. She also noted that Student's handwriting was legible only when he received extended time to complete an assignment; the pace of his writing was slower than his typical peers; and despite sitting in the front of the class, he appeared "to just not be aware of everything."

Student's RSP teacher, Jackie Jones, agreed with Ms. Thomas' observations. She proposed Student continue to receive his core curriculum education in the general education class. She also proposed that Student transfer to her RSP classroom where she could work on his more specific needs, including reading. The occupational therapist expressed a desire to do more assessments in the area of visual perception. She suggested the team consider three additional goals, including a goal in handwriting. The speech and language therapist, Toni Bentley, shared results from an old assessment and informed the team that she would soon be conducting her own assessment. Based on her review of the old assessment, and at the insistence of Ms. Geller, she drafted speech and language goals. Her services were added to the IEP. Based on Student's interest in music, Student's principal, Eldridge Glover, wanted Student enrolled in the campus's band class. Mr. Glover also wanted to get Student's speech and occupational therapy assessments completed. The program specialist, Rise Revis, suggested moving up Student's triennial IEP team meeting so that all assessments could be completed at the same time, thus providing a comprehensive view of Student's unique needs, rather than reviewing Student's profile in a piecemeal fashion. The school psychologist proposed doing the psychological assessment immediately. The behavior specialist observed Student on three separate occasions and in his opinion, there were no suggestions of maladaptive behaviors that would warrant any behavioral support.

Rather than discussing Student specifically, Ms. Geller noted how other districts dealt with students she considered similar to Student. Plaintiff told the team that Student had difficulty following one-step directions and that he needed reminders to complete tasks while at home.

Pending Student's triennial IEP team meeting which was scheduled for October

11

2009, Vacaville proposed an IEP with the following six goals: one in receptive language; two in fine motor skills; one in reading; and one in organization.  The IEP proposed 560 minutes per week of group instruction where Student would receive 80 minutes per week in math, 240 minutes per week in core program support, 140 minutes per week in interventions and diagnostic treatment, 1,407 minutes per year of occupational therapy services, 360 minutes per year for diagnostic treatment addressing speech and language issues, and 1,200 minutes per week in Student's regular education classroom.  The IEP also proposed specialized academic instruction in the areas of math, written language, behavior/organization, and reading.

Plaintiff agreed to the IEP, but signed it with the following reservation: "I am agreeing to the IEP, but the reading goals is [sic] not adequate to address his needs."  The meeting ended and the members agreed to reconvene on October 12, 2009.  Plaintiff requested Vacaville to "hold off" on conducting the academic and psychological assessments and Plaintiff refused to move the completion of Student's triennial assessment forward as suggested by Ms. Revis. Plaintiff expressed concerns that Student had "been assessed too much"; she provided consent only to the occupational therapy and speech/language assessments.

### iii. October 12, 2009 IEP Meeting

Attendees were as follows: Plaintiff; Ms. Geller; the occupational therapist; the general education teacher; the special education teacher; the speech and language therapist; the school psychologist; the principal; and the program specialist.  Student's general education teacher noted Student had difficulty following instructions, he was starting to become distracted, and he was distracting other Students.  The speech and language therapist discussed her assessments and the general education teacher explained informal tests she performed.  Student's academic testing results were reported to the team by the RSP teacher and the occupational therapist discussed the results of his assessment.  The team discussed the ongoing issue of Student's need to wear glasses at all times and his refusal to do so.  Additionally, the team discussed the need for a binocular vision assessment.  Plaintiff consented to Vacaville's request to perform a psycho-educational assessment.  The team discussed Student's future placement. There was no offer of FAPE provided at the conclusion of this meeting because the team agreed to meet

12

1    again in two weeks and to present a comprehensive and detailed IEP at that time.

2                          **iv.  October 27, 2009 IEP Meeting**

3                  Attendees were as follows: Plaintiff; Ms. Geller; a district representative; a school

4    psychologist; a program specialist; a general education teacher; a special education teacher; and a

5    speech and language therapist.  The meeting notes and attached IEP were approximately thirty

6    pages long.  The notes establish that Student's ability and achievement were discussed in detail as

7    measured by formal assessments, informal test results, and educators' observations.  Student's

8    skills in the following areas were reviewed: reading fluency; reading comprehension; spelling;

9    phonemic awareness; math; written language; communication development; gross/fine motor

10   development; social emotional behavior; adaptive/daily living skills; and health.  The team also

11   reviewed Student's statewide assessment results in the following: language arts; math; science;

12   history/social science; and writing.  At this time, Student's general education classroom teacher

13   expressed concern that Student's behavior distracted other students.  Specifically, she indicated

14   that Student was talking to himself, humming, and completely unaware of his environment.

15                 The speech and language therapist had thoroughly assessed Student.  She

16   concluded Student had problems with semantic aspects of language (functional decoding,

17   organizing, and interpreting acoustic signals), reduced knowledge and ability to utilize

18   grammatical structures, difficulty understanding simple and complex language, impaired

19   comprehension of humor or abstract language, significantly delayed expressive and receptive

20   vocabulary, limited verbal output, and difficulty participating in social conversation.  Essentially,

21   she believed Student had severe expressive and receptive language deficits.

22                 In response, the team developed an IEP for Student that included goals in the

23   following areas: reading; reading comprehension; reading fluency; phonemic awareness; written

24   language; paragraph writing; math; number sense; fine motor skills; sensory motor skills-

25   registration; receptive language; on task behaviors; organization; receptive language; syntax;

26   multiple meanings; and behavior.  In total, twenty-two goals were proposed.  Plaintiff consented

27   to the IEP, however, Ms. Geller wrote on the signature page next to Plaintiff's signature, "I

28   believe the goals and services are inadequate to address all of [Student's] identified needs."  No

1   further clarification was offered.

2                                **v.   January 14, 2010 IEP Meeting**

3               Attendees were as follows: Plaintiff; Grandmother; Ms. Geller; the occupational

4   therapist; the school psychologist; the general education teacher; the special education teacher;

5   the speech and language therapist; the coordinator of special education services; an administrative

6   designee; and a facilitator.  School psychologist Pam Kennedy Hunt presented her psycho-

7   educational assessment findings.[6]

8               Ms. Hunt assessed Student at various times from November 12, 2009, through

9   January 6, 2010.  She reviewed Student's educational records and either administered, or had

10  other qualified assessors administer seventeen separate tests.  She interviewed Student and

11  Plaintiff and she made classroom observations.  She then prepared her psycho-educational

12  evaluation report which was twenty-one pages in length, single spaced, and used a small font.

13  Ms. Kennedy Hunt's records review showed Student exhibited weaknesses in higher-level

14  reasoning and cognition as far back as the second grade.  Student's then current assessments

15  showed he had average successive processing skills, below-average skills in simultaneous

16  processing, and a low-average range in planning skills.  His ability to maintain attention was an

17  area of weakness, as was phonological segmentation, phonological awareness, memory and rapid

18  naming.  Ms. Hunt concluded Student had deficits in language, attention, some memory tasks,

19  some phonological processing skills, and some components of visual processing and planning.

20  She also noted Student's difficulties with sensory regulation, metacognitive and executive

21  functioning, adaptive and social/emotional skills and behaviors.

22               Jackie Jones conducted the academic assessment portion of the psycho-educational

23  assessment.  She also worked with student in her RSP classroom from August 2009, to January

24  2010.  Jackie Jones was Student's case manager, attended all of his IEP team meetings, prepared

---

[6]        Ms. Kennedy Hunt holds a bachelor of arts in psychology from the University of California, Berkeley
25  (1971); and a master's in psychology from San Francisco State University (1974).  She holds a credential in Pupil
26  Personnel Services-School Psychology (1975) and an Administrative Services Credential.  She is a licensed
    educational psychologist and she has been a school psychologist in Vacaville since 1976.  Prior to that, she was a
27  school psychologist in Napa, California.  In her 36 years working as a school psychologist, Ms. Kennedy Hunt has
    assessed children at all grade levels.  Over the last seven years, she has exclusively assessed children in preschool
28  through the sixth-grade.  She estimates she has assessed over 1,000 students.

the IEP team meeting notes, and consulted with Student's general education teacher regarding strategies to best address Student's needs.

During the meeting, other team members indicated that Student's general education teacher noticed Student's behavior was steadily deteriorating.  Student was not trying to complete classroom assignments and Student was making faces at the teachers.  Student's occupational therapist reported that he was working on Student's goals and Student was making progress.  Plaintiff reported on Student's health and development and noted he had another eye examination scheduled.  She added Student historically had problems with memory, lack of focus, and difficulty following through with the completion of tasks.  Ms. Geller discussed an unspecified "handicapping condition."  A discussion of whether Student's primary disability should be changed to autism with a secondary disability of speech language followed Ms. Geller's comment.  Ms. Geller suggested a mental health referral and requested that Vacaville provide Student with eight weeks of counseling.  Ms. Geller expressed concern about the "fragmentation" of Student's school day because it involved so much transitioning.  The consensus of the team was that Student's day was indeed too fragmented.  In order to reduce the number of distractions caused by frequent transitions, his placement was changed from the RSP to the special day class (SDC).

The team reviewed Student's progress on the goals from his October 2009 IEP.  Student's reading comprehension goal was modified to increase the accuracy rate from 80 percent to 95 percent at the request of Ms. Geller who believed Student needed a greater challenge.  Also, the team added four goals, one each in the areas of reading, written language, reading phonemic awareness, and math.  On the IEP page titled, "Signature and Parent Consent," Plaintiff checked the box stating that she agreed to all parts of the IEP.

### vi. June 2, 2010 IEP Meeting

Attendees included the following: the IEP facilitator; Plaintiff; Ms. Geller; administrative designee; special education coordinator; program specialist; general education teacher; special education teacher; speech and language therapist; occupational therapists; school

1    psychologist; Dr. Grandison[7] and Patricia Gillian.[8] Dr. Grandison and Ms. Gillian presented

2    their reports and findings.

3              Dr. Grandison's report stated the following:  Student completed the Cognitive

4    Assessment System (CAS) with highly variable results, ranging from a standard score of 57

5    (below the first percentile for attention) to his highest score of 92 (30th percentile).  On the Test

6    of Auditory Processing-3 (TAPS-3), Student's scores were again highly variable, and yet again,

7    on the Comprehensive Test of Phonological Processing, Student's standard scores still varied

8    significantly.  On the Behavior Assessment for Children, Second Edition (BASC-2) completed by

9    Student's teacher, clinically significant problems were seen in the domain that measured school

10   problems for both attention and learning.  On the Behavior Rating Inventory (BRI), Student's

11   general education teacher rated him as "struggling" on initiating, working memory,

12   planning/organizing, organization of materials, and monitoring.  Student's special education

13   teacher rated him similarly.  In her interview, Plaintiff confirmed that Student struggled with

14   working memory as well as planning and organizing.

15             Dr. Grandison's report noted that Plaintiff took Student to the Regional Center for

16   an assessment.  The Regional Center assessment was done by Dr. Powers, whose assessment

17   included the administration of the Stanford-Benet Intelligence Scale, 5th Edition, for which

18   Student obtained a Full Scale Intelligence Quotient (IQ) of 72.[9]  Dr. Powers, however, concluded

19   ───────────────

20   [7]      Dr. Grandison is a developmental neuropsychologist.  She holds a bachelor of arts degree in psychology
     from the University of Helsinki (1986); a master's degree in psychology from Boston University (1988); a Ph.D. in

21   developmental psychology from Boston University (1992); and the completion of a postdoctoral fellowship from
     Children's Hospital, in Boston, Massachusetts. (1993). She has been a licensed clinical psychologist in California

22   since 1996.  From 1994 through 1995, she was a Clinical Instructor, Department of Psychiatry, Harvard Medical
     School; from 2003 through 2006 she served as the Director of the Neuropsychology Assessment Service, Children's

23   Hospital, Oakland, California.  She currently serves as an Assistant Clinical Professor, Department of Psychiatry,
     University of California, San Francisco, where she has worked since 1997.  This work includes her supervision of

24   postdoctoral fellows.  Lastly, her Curriculum Vitae shows she has presented at 37 scientific meetings.  Since 2006,
     she has worked exclusively in private practice conducting assessments of children.  Her assessment of Student took
     place over the course of five separate appointments in March and April of 2010.

25   [8]      Ms. Gillian is an audiologist.  She holds a bachelor of arts and master's degrees, in communicative disorders
     from San Francisco State University, 1979 and 1980, respectively.  She has been a licensed audiologist in California

26   since 1981.  Dr. Gillian assessed Student and prepared her report in March 2010.  As part of her assessment she
     obtained a history from Plaintiff.  Plaintiff advised her that Student was diagnosed with Attention Deficit Disorder

27   (ADD) in January 2010, but that presently he was not taking his medication.
     [9]      A Full Scale IQ of 70 is a qualifying condition for receipt of services for mental retardation under the

28   Lanterman Act.  The Lanterman Act is a comprehensive statutory scheme designed to provide supports and services
     for persons with developmental disabilities.  The Act has a two-fold purpose: (1) to prevent or minimize the

1    that Student did not meet the definition for Autism, as set forth in the Diagnostic and Statistical

2    Manual of Mental Disorders, Fourth Edition (DSM-IV), but rather Student met the DSM-IV

3    criteria of Borderline Functioning and Task Expressive/Receptive Disorders.

4            Due to the conflicting results on previous IQ examinations and achievement tests,

5    Dr. Grandison administered two IQ testing instruments, the Wechsler Intelligence Scale for

6    Children, Fourth Edition (WISC-IV) and the Comprehensive Test of Non-Verbal Intelligence

7    (CTONI).  Based on these assessments, Dr. Grandison concluded Student confronted challenges

8    in the following areas: verbal comprehension; social reasoning; vocabulary; working memory;

9    and processing speed.

10            Dr. Grandison noted that in the area of academic functioning, "significant

11   concerns" emerged.  Dr. Grandison concluded the following: Student's reading skills were at the

12   second and third grade levels; his reading comprehension was at an early second grade level; his

13   ability to decode was at the later range of the second grade level; and his spelling skills were at a

14   mid-second grade level.  Dr. Grandison noted Student's "relative" strength was in math, where

15   Student functioned at a third and fourth grade level.

16            Ultimately, Dr. Grandison's report concluded that Student needed the following

17   programs:

18           A Lindamood-Bell, Orton Gillingham/Slingerland approach to
             remediate his dyslexia; A placement where Student would be taught
19           according to grade level standards; A seamlessly integrated social
             pragmatic program; An assistive technology assessment; and A
20           placement at the STAR Academy in San Rafael.

21

22            Ms. Gilliam then presented her findings and concluded that Student had areas of

23   weakness in the auditory processing system "indicating that he is not performing optimally at this

24   time."  She also noted that her findings were indicative of an auditory processing deficit disorder.

25   She recommended modifications to Student's school environment as follows: placement in a

26   institutionalization of developmentally disabled persons and their dislocation from family and community; and (2) to
27   enable developmentally disabled persons to approximate the pattern of living of nondisabled persons of the same age
     and to lead more independent and productive lives in the community.  (Welf. & Inst. Code, §§ 4501, 4509, 4685,
     4750 & 4751; *see generally Association for Retarded Persons v. Department of Developmental Services*, 38 Ca1.3d
28   384, 388 (Cal. 1985).)

1   well-structured classroom with a dynamic teacher who used an eclectic approach to teaching; a

2   teacher who ran a "tight ship"; a reduction in ambient noise; seating in the front of the class;

3   encouragement for Student to write down assignments; a separate workstation in the back of the

4   room; and a teacher who is readily able to refocus Student's attention if he becomes distracted.

5         After these reports and findings were presented, the facilitator again asked for an

6   itemization of what Student's needs were and the facilitator then summarized the team's view as

7   follows: Student had a language-based learning disorder; difficulty in social pragmatics; self-

8   esteem problems; reading and writing challenges; difficulty filtering out irrelevant information;

9   cannot track two messages delivered at the same time; an inability to process rapid speech;

10   behavioral problems; needs clarifications of instructions to be given; and needs a structured

11   classroom.  With respect to the STAR placement, the Vacaville members of the team believed it

12   was too early to change Student's placement again, particularly without having reviewed Dr.

13   Swain's speech and language assessment and the results of the pending binocular vision

14   assessment that had already been initiated by Vacaville.  Additionally, because the school year

15   was near its end and Student's annual IEP team meeting was scheduled to be held in the early fall

16   of the following school year, the Vacaville members of the team wanted an opportunity to review

17   Student's progress on his goals to determine if the deficits discussed by Dr. Grandison and Ms.

18   Gillian manifested themselves in the classroom.

19                **D. Sixth Grade Year (2010−2011)**

20                   **i.  August 18, 2010 IEP Meeting**

21         This meeting was attended by the following: Plaintiff; Ms. Geller; an

22   administrative designee; the program specialist; the occupational therapist; the school

23   psychologist; the speech and language therapist; the literacy coach; and Dr. Tran of the University

24   of California School of Optometry (Berkeley).  The purpose of this meeting was to review Dr.

25   Tran's findings following her binocular vision and perceptual skills assessment.

26         Dr. Tran presented her findings by telephone.  She determined that Student had

27   deficits in phonemic awareness, a slow reading rate, and deficits in visual spatial skills.  She

28   concluded, however, that Student did not need vision therapy.  Dr. Tran and the other IEP team

1    members were primarily concerned with Student simply not wearing his glasses.  Based on Dr.

2    Tran's explanation of her findings, no modifications were made to Student's IEP.

3           During the meeting Ms. Geller asked Dr. Tran numerous questions regarding her

4    findings and questioned the thoroughness of her assessment.  Dr. Tran answered Ms. Geller's

5    questions and defended the accuracy of the assessment.  At the conclusion of the meeting, Ms.

6    Geller stated that she felt the assessment was not well done and that the Berkeley clinic was not

7    that good anymore.

8                    **ii.  August 26, 2010 IEP Meeting**

9           Attendees were as follows: Plaintiff; Ms. Geller; two program specialists; the

10   special education teacher; the occupational therapist; the speech and language therapist; the

11   school psychologist; the literacy coach; and Dr. Swain.[10]  The purpose of the meeting was to

12   review the report prepared by Dr. Swain, who appeared telephonically.

13          Dr. Swain administered the following tests: the Lindamood Auditory

14   Conceptualization Test; the Test of Auditory Processing Skills-3rd Edition (TAPS-3); the Wide

15   Range Achievement Test (WRAT); the Test for Auditory Processing Disorders for Children

16   (SCAN-C); the Listening Inventory; and the Programs for Advancement, Challenge and

17   Enrichment (PACE) screening.

18          Dr. Swain found that Student experienced difficulty with auditory processing,

19   explaining that auditory processing disorder was a deficit in processing auditory input, which may

20   be exacerbated in "unfavorable acoustic environments."  (As previously mentioned, Student's

21   classrooms were not "unfavorable acoustic environments.")  Dr. Swain recommended

22   environmental modifications such as having teachers watch Student for signs of his lack of

23   attention, concentration, or understanding; having Student take untimed tests; providing Student

24   with preferential seating; eliminating visual and auditory distraction in the classroom; reducing

25   ambient noises in the classroom; and presenting auditory information produced at a normal rate of

26   ───────────────
     [10]      Dr. Swain is a speech and language pathologist and the owner/director of The Listening Center, Advanced
27   Treatment for Listening, Communicating and Learning.  She holds a bachelor of arts in speech pathology and
     audiology from Sacramento State University (1972); a master's in speech pathology, Sacramento State University
28   (1975); and a Ed.D., from the University of Lavern (1995).  She has been a licensed speech and language pathologist
     in California since 1975.  Dr. Swain assessed student on March 24, 2010. She prepared a report dated Apri1 23, 2010.

                                             19

speech, with good use of pitch variation and vocal expression.  Dr. Swain also recommended that compensatory strategies be implemented such as having Student ask for clarification when he did not understand what was being said; writing down all homework assignments, reminders or instruction; and the use of multi-sensory learning.

After reviewing all of the independent assessors' findings, including Dr. Swain's, the team agreed that Student yielded inconsistent scores in his assessments as well as in his performance at school.  Plaintiff stated that this inconsistency had been an on-going issue with Student and that he, "does well on some days and then not so well on other days."  Rise Revis discussed using a program entitled Systematic Instruction in Phoneme Awareness, Phonics, and Sight Words (SIPPS) to address phonemic awareness in lieu of the Lindamood-Bell program.  Ms. Revis offered the suggestion because SIPPS was a state approved curriculum and was the curriculum adopted for use in Vacaville.  Student's sixth grade SDC teacher, Marie Villanueva, advised the team that she was trained in SIPPS and that SIPPS therefore be integrated with the Houghton-Mifflin program as a reading intervention.  The team also discussed the use of the "Language!" program as yet another potential reading intervention to be used in the fall.  The team again noted that Student was not using his glasses, and that he was not bringing his backpack to school consistently.

Plaintiff's primary concern was that Student did not feel comfortable in his current placement and that he wanted to return to the general education classroom.  Ms. Geller then advised the team that she wanted to be given research information on the effectiveness of the SIPPS program in remedying dyslexia.  Ms. Geller also stated that she wanted Student's placement to be changed to the STAR Academy.

### iii.  October 21, 2010 and December 9, 2010 IEP Meetings

Student's scores from approximately a dozen tests were reviewed.  Student's writing ability was gauged by having him write a single paragraph, which he was able to compose with a passing grade but only if he received editing help.  Prior to editing, his single paragraph was poorly sequenced.  Student wrote in simple sentences and he continued to have trouble with run-on sentences due to his lack of punctuation.  Student read with no expression.  Student

struggled with decoding multisyllabic words.  In math, Student could multiply two digit times one digit problems with 80 percent accuracy; two digits times multi-digits at 85 percent accuracy; two digits divided by one digit with 79 percent accuracy; and dividing multi-digit numbers by two digits with 30 percent accuracy.  Student needed teacher prompting to complete the computations. Student made simple calculation errors when he did not work carefully.  Student's verbal assessments showed he could speak simple sentences that were grammatically correct 100 percent of the time.  However, when asked to create a longer sentence, he changed his words around incorrectly and made utterances that did not make sense and/or were grammatically incorrect. Student was able to resolve ambiguities in sentences with 90 percent accuracy; answer who, what, when, and where questions with 83 percent accuracy; communicate thoughts/feelings with 85 percent accuracy; identify the number of sounds within a word with 100 percent accuracy; and manipulate words at the single word level with 100 percent accuracy.

The team reviewed Student's progress on each of his twenty-two goals and noted Student had made some progress on all goals and actually made significant progress on others. The team proposed thirteen goals (some of which were new, while other existing goals were revised).  Plaintiff agreed in concept to seven of the thirteen goals.  The team continued to review the IEE assessments of Dr. Grandison, Dr. Swain, and Ms. Gillian.  The team discussed Dr. Swain's report and recommendations.  Vacaville created a chart to identify which recommendations should be implemented versus those that were already being implemented. With Dr. Grandison's and Ms. Gillian's reports, the team abandoned the use of charts because it had taken so long to use them with Ms. Swain's report.  However, the team continued to discuss and consider the appropriateness of the recommendations of Dr. Grandison, Dr. Swain, and Ms. Gillian.

After meeting for six hours, Vacaville offered Student an IEP that contained new and revised goals; continued Student's placement in the SDC class at the Sierra Vista campus; provided school psychologist services for 30 minute sessions over the following eight weeks with a referral for Student to receive a mental health assessment from the County Office of Mental Health should the psychologist deem it appropriate; provided speech and language therapy for 60

1    minutes per week; and provided occupational therapy services for fifteen minutes per week, over

2    36 weeks with 30 minutes of occupational therapy consult time per week.  Plaintiff, on the advice

3    of Ms. Geller, did not consent to the proposed IEP.[11]

4        **III.    STANDARD OF REVIEW**

5            Courts reviewing an IDEA due process appeal must review the records of the

6    administrative proceedings; hear additional evidence at the request of a party; and grant such

7    relief as it deems appropriate, basing its decision on the preponderance of the evidence.  20

8    U.S.C. § 1415(i)(2)(C).  The preponderance of evidence standard is not, however, an invitation

9    for reviewing courts to discount the administrative proceedings.  *Bd. of Educ. of the Hendrick*

10   *Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).  Instead, reviewing courts must

11   give due weight to an administrative decision's findings of fact and avoid substituting their

12   opinions of sound educational policy for those of school authorities.  *Id.*  While reviewing courts

13   determine for themselves how much deference is due, they must carefully consider administrative

14   findings and assess whether they are "thorough and complete."  *Capistrano Unified School Dist.*

15   *v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).  "The amount of deference accorded the hearing

16   officer's findings increases where they are 'thorough and careful.'"  *Id.* (citing *Union Sch. Dist. v.*

17   *Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).  All other findings may be accepted or rejected in the

18   court's discretion.  *Id.*

19       **IV.    ANALYSIS**

20           Student contends that both Fairfield and Vacaville failed to comply with the

21   procedural and substantive requirements of the IDEA.  Accordingly, this Court shall address each

22   school district separately.

23       **A.  Fairfield**

24           Student claims that Fairfield (1) failed to assess Student in all suspected areas of

25   disability; (2) did not offer a requested audiological examination for an auditory processing

26   disorder; (3) did not complete Student's annual IEP in October 2008; (4) did not timely conduct

27

28   [11]      At least two additional IEP team meetings have been held after this October 21, 2010 IEP took place, bringing the total number of IEP meetings in the last eighteen months to thirteen .

1    IEP meetings in follow up to the October 2008 IEP meeting; (5) did not timely conduct IEEs; and

2    (6) improperly held an IEP meeting without Plaintiff.  Student further claims these procedural

3    violations deprived Student a FAPE.  (ECF No. 54 at 10−14.)

4                   "In matters alleging a procedural violation, a hearing officer may find that a child

5    did not receive a free appropriate public education only if the procedural inadequacies: (1)

6    impeded the child's right to a free appropriate public education; (2) significantly impeded the

7    parents' opportunity to participate in the decision making process regarding the provision of a

8    free appropriate public education to the parents' child; or (3) caused a deprivation of educational

9    benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).  As discussed below, the administrative record

10   establishes that none of the above factors are met.

11                **i.  Plaintiff's Contention that Fairfield Failed to Assess Student in All**

12                      **Suspected Areas of Disability**

13                   As previously referenced, during Student's October 24, 2008, annual IEP review,

14   the team discussed Student's weakness in math, reading, writing, and on task behavior.  Plaintiff

15   and Ms. Geller attributed Student's challenges, in part, to their shared belief that he had auditory

16   processing deficits.  After the meeting, and in direct response to specific concerns raised at the

17   meeting, Fairfield provided Plaintiff with an assessment plan.  The plan offered three

18   assessments: an audiological assessment for an APD, a language/speech/communication

19   assessment, and a general ability assessment.  (AR 948.)  Plaintiff, acting through Ms. Geller,

20   rejected the assessment plan.  (AR 948, 1232−33.)  As such, Fairfield did not conduct the

21   assessments.

22                   Plaintiff's failure to consent to the testing absolved Fairfield of its duty to assess

23   Student and provide Student with the applicable examinations.  20 U.S.C. § 1414 (d)(ii)(III)(aa)

24   ("If the parent of such child refuses to consent to the receipt of special education and related

25   services, or the parent fails to respond to a request to provide such consent the local educational

26   agency shall not be considered to be in violation of the requirement to make available a free

27   appropriate public education to the child for the failure to provide such child with the special

28   education and related services for which the local educational agency requests such consent.")

Plaintiff now contends that there was no place on the form to sign and therefore consent.  (ECF No. 54 at 12.)  However, this contention conflicts with the testimony given by Ms. Geller and the letter that she sent to Ms. Castro, on Plaintiff's behalf, dated November 7, 2008.  In this letter, Ms. Geller stated

> During the meeting [October 24, 2008], we discussed a comprehensive audiological evaluation by an audiologist for [Student] to consider his needs related to a suspected auditory processing disorder and to learn where the process breaks down. [Mother] noted that an audiologist had assessed his hearing acuity in the past.  The assessment plan notes "Audiological Assessment" but [Mother] believes the description of the assessment is ambiguous and [sic] general and does not appear to address her specific request for [Student].

(AR 430.)  This letter contradicts Plaintiff's assertion that Fairfield failed to offer the necessary testing and that she did not have the option of consenting to the IEP.  Thus, the record supports the ALJ's finding that Fairfield offered an educational program that was reasonably calculated to provide Student with a FAPE and that Plaintiff's refusal to consent deprived Student of the very assessment needed to confirm or to rule-out the existence of suspected disorders.

### ii.  Plaintiff's Contention that Fairfield Failed to Offer Student the Requested Audiological Examination

As shown above, Fairfield did in fact offer to provide Student with an audiological examination.  (AR 948.)  However, the record reflects that Plaintiff on the advice of Ms. Geller did not consent to the assignment plan.  (AR 1232−1233.)  Therefore, Fairfield was absolved of its duty to assess Student.  *See* 20 U.S.C. § 1414(d)(ii)(III)(aa) (stating that if a parent fails to consent or respond to a request for consent of services, the school shall not be considered to have violated its duty to provide a FAPE).  As such, the Court finds that Plaintiff's claim is without merit.

### iii.  Plaintiff's Contention that Fairfield Failed to Timely Complete Student's October 2008 IEP

Plaintiff contends that Fairfield impermissibly failed to complete Student's annual IEP in October 2008 and did not timely conduct IEP meetings to follow up to the October 2008 IEP meeting.  (ECF No. 12−13.)  In support of this contention, Plaintiff claims that the offered

1   IEP was merely a draft or a discussion document because, among other things, the October 24

2   meeting did not "conclude" on that date and Fairfield did not file a due process action compelling

3   implementation of the IEP.  Again, this contention is undermined by Ms. Geller's

4   correspondence, referenced above.  In addition, evidence sent by Plaintiff on December 15, 2008,

5   also contradicts this contention.  (See AR 1232−1233 (stating that Plaintiff had received the IEP,

6   but was rejecting it because she did not "believe that the IEP documents appropriately address

7   [her] concerns."))  Plaintiff bears the burden of showing that Fairfield did not complete the IEP.

8   She has failed to submit any correspondence that would support the contention that the IEP

9   offered after the October 2008 meeting was a draft.  As such, the Court finds that the record

10  reflects that Fairfield did in fact complete Student's annual IEP in October 2008.

11              **iv.  Plaintiff's Contention that Fairfield Failed to Timely Conduct a Follow**

12                  **Up IEP Meeting in Order to Conclude the October 2008 IEP Meeting**

13              Plaintiff alleges that Fairfield did not timely conduct an IEP meeting to follow up

14  and conclude the October 2008 IEP meeting.  (ECF No. 12−13.)  As referenced above, there is no

15  evidence that the October 2008 Meeting was not properly concluded.  Furthermore, the fact that

16  subsequent meetings were held in March of 2009 does not support Plaintiff's contention.  Plaintiff

17  claims she asked for a continued meeting on October 24, 2008, and that pursuant to California

18  Education Code § 56343.5, she was entitled to have such a meeting by November 24.  This

19  argument fails because Plaintiff testified that she requested a subsequent meeting to follow up on

20  Student's progress, not as a continuation to the October 24 meeting.  (See Hr'g Tr. 140:19−25,

21  Dec. 2, 2010.)  Specifically, in response to counsel's question as to whether she requested another

22  meeting as a continuation of the October 2008 Meeting, Plaintiff stated:

23              No, I wanted to see for myself if it was really just for the point
            because, I wanted to see if there was any change in his reading
24              skills.  But that was separate from the meeting.  I wanted to have a
            different meeting with them to see if his reading changed from
25              when he had his glasses for that period of time.  Because he didn't
            have glasses so I didn't know if that affected his reading.  So I
26              wanted to see if his scores changed but that was not part of that.
            That was just for my own self, like I have my own little thing just to
27              see where his progress was.

28  (Hr'g Tr. 140:16−25, Dec. 2, 2010.)  Plaintiff's testimony confirms that the subsequent meeting

1   in March was not scheduled for the purpose of continuing the October 2008 IEP meeting.

2   Therefore, because Plaintiff has not provided any evidence supporting her contention, she has not

3   met the burden of showing that Fairfield did not complete Student's IEP meeting or that Fairfield

4   delayed scheduling a follow up meeting to conclude the IEP.

5               **v.   Plaintiff's Contention that Fairfield Delayed Conducting Student's**

6                      **IEEs**

7               Plaintiff contends that Fairfield impermissibly delayed conducting independent

8   educational evaluations ("IEEs").  Pursuant to C.F.R. § 300.502(b)(2)(ii), "if a parent requests an

9   independent educational evaluation at public expense the public agency must, without

10  unnecessary delay . . . ensure that an independent educational evaluation is provided at public

11  expense."  "If an independent educational evaluation is at public expense, the criteria under

12  which the evaluation is obtained, including the location of the evaluation and the qualifications of

13  the examiner, must be the same as the criteria that the public agency uses when it initiates an

14  evaluation, to the extent those criteria are consistent with the parent's right to an independent

15  educational evaluation."  34 C.F.R. § 300.502(e).

16              The record includes a letter from Ms. Geller to Fairfield dated November 7, 2008,

17  in which she requested independent psycho-educational, speech and language assessments.

18  However, at that point in time, Fairfield had not received a written authorization from Plaintiff

19  indicating that Ms. Geller had authority to make such requests on her behalf.[12]  As such, the

20  Fairfield sent Plaintiff a letter on November 25, 2008, informing her that she could make the

21  requests directly.  By a letter dated December 5, 2008, drafted by Ms. Geller and signed by

22  Plaintiff, Plaintiff confirmed that she would like the IEEs requested by Ms. Geller and that Ms.

23  Geller could represent her son's educational interests.  On December 16, 2008, the Fairfield

24  consented to Plaintiff's request for the IEEs.  Immediately thereafter and for at least the

25  remainder of the school year, Andrew Green-Ownby, the Fairfield's Director of Special

26  Education, proceeded to contact Plaintiff's preferred assessors, Dr. Guterman and Dr. Swain, to

27  _____

    [12]        The parties disagree as to whether Fairfield had previously received authorization from Plaintiff allowing
28  Ms. Geller to act on her behalf.  However, because this dispute is irrelevant to Plaintiff's claims, this issue is not
    addressed in detail.

1  determine whether they met Solano Special Education Loan Plan Area ("SELPA") criteria and

2  were willing to conduct the IEEs.  Unfortunately, Mr. Green-Ownby's efforts in arranging the

3  IEEs were frustrated because Plaintiff or Ms. Geller had provided the wrong address for Dr.

4  Guterman, so the correspondence did not reach her.  In addition, Dr. Swain declined to accept the

5  District's contract for services without making significant changes, including a refusal to observe

6  Student in an educational setting.

7  Due to these delays, Fairfield requested input regarding any other assessors

8  Plaintiff preferred.  Plaintiff and/or Ms. Geller either failed to respond to Fairfield entirely, or

9  merely declined the alternative assessors offered by Fairfield, with one exception.  During the

10  2008−2009 school year, Plaintiff suggested one alternate assessor, Elea Bernou, in April 2009.

11  However, Ms. Bernou lacked the credentials required by the Solano SELPA criteria to conduct

12  cognitive assessments.  Accordingly, Fairfield was forced into a holding pattern while trying to

13  agree on terms with Dr. Swain and while searching for an alternative assessor.  Based on the

14  foregoing, the Court finds that Fairfield was diligent in its efforts to obtain the IEEs and that

15  Plaintiff has not shown that Fairfield unnecessarily delayed obtaining the IEEs.

16  **vi.  Plaintiff's Contention that Fairfield Improperly Held Student's May**

17  **IEP Meeting Without Plaintiff**

18  Plaintiff contends that Fairfield failed to comply with California Education Code §

19  56341.5(c) because the May 2009 IEP meeting was not scheduled at a mutually agreeable time

20  and place.  (ECF No. 54 at 8−9.)

21  The relevant parts of the California Educational Code provide:

22  (a) Each local educational agency convening a meeting of the
    individualized education program team shall take steps to ensure
23  that no less than one of the parents or guardians of the individual
    with exceptional needs are present at each individualized education
24  program meeting or are afforded the opportunity to participate.

25  (b) Parents or guardians shall be notified of the individualized
    education program meeting early enough to ensure an opportunity
26  to attend.

27  (c) The individualized education program meeting shall be
    scheduled at a mutually agreed-upon time and place.  The notice of
28  the meeting under subdivision (b) shall indicate the purpose, time,

and location of the meeting and who shall be in attendance.  Parents or guardians also shall be informed in the notice of the right, pursuant to Section 300.322(b)(1)(ii) of Title 34 of the Code of Federal Regulations, to bring other people to the meeting who have knowledge or special expertise regarding the individual with exceptional needs . . .

(g)  Pursuant to Section 300.322(c) of Title 34 of the Code of Federal Regulations, if no parent or guardian can attend the meeting, the local educational agency shall use other methods to ensure parent or guardian participation, including individual or conference telephone calls, and consistent with Section 300.328 of Title 34 of the Code of Federal Regulations, the parent or guardian and the local educational agency may agree to use alternative means of meeting participation.

(h)  A meeting may be conducted without a parent or guardian in attendance if the local educational agency is unable to convince the parent or guardian that he or she should attend.  In this event, the local educational agency shall maintain a record of its attempts to arrange a mutually agreed-upon time and place, such as:

(1)  Detailed records of telephone calls made or attempted and the results of those calls.

(2)  Copies of correspondence sent to the parents or guardians and any responses received.

(3)  Detailed records of visits made to the home or place of employment of the parent or guardian and the results of those visits.

C.E.C. § 56341.5; *see also* 20 U.S.C. § 1414(f); 34 C.F.R. § 300.328 (stating that if a parent cannot attend a scheduled IEP meeting, and if the local education agency ("LEA") cannot convince the parent to attend, the meeting may be held without the parent but only if the LEA has records of its attempts to arrange the meeting.  A parent may attend parent or participate by phone conference call, or other alternative method.).

Should a court find that a school violated the procedures set forth in the California Education Code, such violation may be found to deprive a child's right to a FAPE only if it: "(1) impeded the child's right to a free appropriate public education; (2) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a free appropriate public education to the parents' child; or (3) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).  As such, if the Court were to find that Fairfield's

28

1    decision to hold the IEP without Plaintiff constitutes a procedural inadequacy, one of the

2    aforementioned criteria must be met for Student to succeed in his claim.  For the reasons set forth

3    below, Plaintiff has failed to meet this burden.

4            Ms. Killiam was tasked with scheduling Student's May IEP Meeting.  Ms. Killam

5    testified that it is her practice to attempt to schedule dates and times of future IEP team meetings

6    before concluding the current meeting.  At the conclusion of the March 2009 IEP team meeting,

7    Ms. Killam discussed meeting times with Plaintiff and Ms. Geller.  None of the several dates Ms.

8    Killam proposed were mutually agreeable to Ms. Geller or Plaintiff.  In addition, Ms. Killam

9    persuasively testified that scheduling the IEP meetings was difficult because of the number of

10   participants and the need to schedule a facilitator.  Due to Plaintiff's busy school schedule, she

11   had little availability.  Ultimately, Ms. Killam set Student's IEP team meeting for May 22, 2009,

12   and properly provided notice to Plaintiff well in advance of the meeting date.  In addition, Ms.

13   Killam sent a draft of the proposed IEP for Plaintiff's review prior to the meeting to facilitate and

14   encourage her participation.

15           Plaintiff's testimony confirmed that scheduling this meeting was difficult due to

16   her school schedule and the different schedules of the team members.  (*See* Hr'g Tr. 146:10−25,

17   223:3−21, Dec. 2, 2010.)  Plaintiff testified that she had already decided to move out of the

18   Fairfield School System prior to the scheduling of this meeting.  (*See* Hr'g Tr. 203:9−19, Dec. 2,

19   2010.)  Further, Plaintiff stated that she did not bother to open the packet of information that

20   Fairfield had sent concerning the IEP Meeting.  (*See* Hr'g Tr. 203:9−19, Dec. 2, 2010.)

21   Plaintiff's testimony confirms that she had no intention of keeping Student in the Fairfield School

22   System or of utilizing IEPs from the plan.  Furthermore, her absence did not impede Plaintiff's

23   opportunity to participate.  She was provided with notes as to what was discussed in the meeting

24   and could have provided feedback or asked questions about the suggested plan.  Instead, she

25   chose not to participate or even open the packet.  Thus, Plaintiff's absence from the meeting did

26   not result in an impediment of Student's right to a FAPE, a deprivation of educational benefits, or

27   significantly impede Plaintiff's opportunity to participate in the decision making process.  20

28   U.S.C. § 1415(f)(3)(E)(ii).

1

**B.  Vacaville**

2        Student and his family moved to Vacaville in June of 2009.  Student and Plaintiff

3   contend that the Vacaville School system was aware of Student's "severe expressive and

4   receptive disorder" because they were identified by Vacaville's own assessments and that they

5   had access to the results of the IEEs that Fairfield paid for in June 2010, and that Vacaville still

6   failed to meet Student's needs.  Specifically, Plaintiff contends that Vacaville failed to: (1) offer

7   services that allowed Student to make progress in reading; (2) offer services that addressed

8   Student's processing disorder; and (3) consider a change in Student's program after Student failed

9   to progress.  (ECF No. 54 at 21−29.)

10              **i.   Plaintiff's Contention that Vacaville Failed to Offer Services to**

11                    **Improve Student's Reading Skills**

12        Plaintiff contends that Vacaville should have implemented a program that included

13   2.5 to 3.0 hours per day of intensive intervention reading program, pursuant to the California

14   Department of Education's guidelines for students that are more than two years behind in reading.

15   (*See* ECF No. 54 at 22−23 (citing Reading/Language Arts Framework for California Public

16   Schools).)  As referenced by Plaintiff, the applicable framework states that "[e]ducators will use

17   this framework and the content standards as a roadmap for curriculum and instruction."  (ECF

18   No. 54 at 23.)

19        The IDEA mandates that a student's IEP be reasonably calculated to provide the

20   student with some educational benefit.  "The educational opportunities provided by our public

21   school systems undoubtedly differ from student to student, depending upon a myriad of factors

22   that might affect a particular student's ability to assimilate information presented in the classroom.

23   The requirement that States provide 'equal' educational opportunities would thus seem to present

24   an entirely unworkable standard requiring impossible measurements and comparisons."  *See*

25   *Hendrick Hudson*, 458 U.S. at 198.  Accordingly, the IDEA does not require school districts to

26   provide special education students with the best education available, or provide instruction

27   services that maximize a student's abilities.  *Id.* at 198–200.  As such, the question is whether

28   Vacaville developed a suitable plan to provide Students with adequate education.

1    The ALJ ultimately found: "Student was provided a FAPE at all times throughout

2    his fifth grade year.  Vacaville thoroughly conducted, completed, and reviewed the assessments to

3    which Plaintiff consented.  Plaintiff's refusal to move forward the triennial assessments and IEP

4    team meeting to earlier in the school year, effectively prevented Vacaville from doing any more

5    than it did, at any time sooner, and supports a finding of parental non-cooperation."  (AR 291,

6    finding 35.)  For the reasons set forth below, the Court finds that the record substantially supports

7    the ALJ's findings.

8    Vacaville was obligated to implement services comparable to Student's last agreed

9    upon and implemented IEP.  Due to Plaintiff's refusal to consent to any of Fairfield's proposed

10   IEPs, Student's governing IEP remained the November 2007 IEP.  As previously discussed

11   herein, the IEP team met in early August 2009 to discuss the previous IEP; collect information

12   from teachers; have the RSP teacher conduct informal assessments; and consider any assessment

13   requests.  In an effort to determine Student's unique needs, the educational members of the team

14   requested consent from Plaintiff to assess Student in the areas of academic achievement; language

15   and communication; and occupational therapy.  However, Plaintiff did not consent.

16   Again at the August 31, 2009 meeting, Vacaville requested that Student's triennial

17   assessment be moved forward in order to implement a more appropriate plan.  In response,

18   Plaintiff requested Vacaville to "hold off" on conducting the academic and psychological

19   assessments and refused to move the completion of Student's triennial assessment forward

20   because Plaintiff believed Student had "been assessed too much."  Thus, she provided consent

21   only to the occupational therapy and speech/language assessments and delayed Vacaville in

22   identifying Student's needs.  Moreover, this Court notes that the guidelines that Student contends

23   were not followed are merely guidelines and not a mandatory requirement of the IDEA.

24   However, the record reflects that Vacaville's education plan for Student did in fact comport to

25   these guidelines.

26   The ELA Framework recommends 2.5 to 3 hours per day of intensive

27   reading/language arts.  Ms. Revis testified that reading/language arts encompassed reading,

28   writing, listening, and speaking.  (Hr'g Tr. 88:1−4, Dec. 17, 2010.)  It is not, as Plaintiff suggests,

31

1   limited exclusively to reading.  Furthermore, there is no evidence that Student received less than

2   the prescribed 2.5 to 3 hours of reading/language arts.  Ms. Revis, among other witnesses,

3   testified that it is Vacaville's practice to provide students at least two hours per day of just the

4   Houghton Mifflin reading/language arts program.  (Hr'g Tr. 92:17−94:15, Dec. 17, 2010.)  Ms.

5   Revis explained that Vacaville uses Houghton-Mifflin materials for core reading/language arts

6   curriculum with all students.  (Hr'g Tr. 15:12−18:1, Dec. 17, 2010.)  The curriculum is also used

7   to provide intensive reading intervention remediation to students with disabilities.  This

8   curriculum included a reading intervention program that helped with pre-teaching, slowing down

9   the pace, providing small group instruction, and related strategies.  (Hr'g Tr. 15:12−18:1, Dec.

10  17, 2010.)  Ms. Thomas, Ms. Jones, and Ms. Steiert testified to using Houghton-Mifflin's reading

11  intervention program with Student.

12          Additionally, both Ms. Jones and Ms. Steiert also testified to providing Student

13  additional intensive reading intervention using a variety of reading programs, such as the LiPS

14  component of the Lindamood-Bell program, Read Naturally, Earobics, and Zoophonics.  Ms.

15  Jones used integrated techniques and strategies with Student including one-on-one work,

16  verbalizing/visualizing, mind mapping, reading out loud, using manipulatives, pre-tutoring,

17  segmentation of sounds within words, and using a focus wall.  Ms. Steiert used Read Naturally

18  for fluency, Houghton-Mifflin for "core" and intervention, and Language! for phonemic

19  awareness as well as incorporating reading strategies in her work with Student, such as

20  scaffolding, use of visuals, pre-teaching, writing, and use of graphic organizers.  (Hr'g Tr.

21  198:15−206:1, Dec. 15, 2010.)   In fact, Ms. Jones described the services she provided Student as

22  "intensive," because Student "was spending lots of time with me [in RSP] doing various reading

23  skills, skill-building, decoding, improvement, at least four days a week," for up to two hours per

24  day.  (Hr'g Tr. 268:15−269:17, Nov. 30, 2010; see also Hr'g Tr. 50:1−24, 55:7−19, 270:2−13,

25  Nov. 30, 2010.)  Finally, the notes from the IEP Meeting on August 26, 2010 reflect that for

26  Student's sixth grade year, SDC teacher Ms. Villanueva planned to integrate SIPPS with the

27  Houghton-Mifflin program as a reading intervention.  (AR 1083).

28          Plaintiff has not presented any evidence that Student was not provided 2.5 to 3

32

1    hours of reading/language arts in the SDC.  In contrast, the testimony of Student's teachers

2    support a finding that he was provided an intensive program, aimed at developing Student's

3    reading skills which went well beyond the recommended hours.  As such, the Court finds that the

4    ALJ's determination is substantially supported by the administrative record.

5                    **ii.   Plaintiff's Contention that Vacaville Failed to Offer Services that**

6                          **Addressed Student's Processing Disorder**

7                    Plaintiff next argues that although the IEPs that Vacaville created for student

8    include some of the accommodations recommended by the IEEs, they do not include the services

9    and accommodations that the IEEs determined necessary for Student to make educational

10   progress.  (ECF No. 54 at 24.)  Specifically, Plaintiff contends that Dr. Grandison identified

11   several programs that she recommended for Student and that Vacaville failed to utilize any of her

12   suggestions, with the exception of the five month period in which Student was taught using the

13   Lindamood-Bell program.  (ECF No. 54 at 29.)  The Court finds that Plaintiff's assertion is not

14   supported by the record.

15                   Dr. Grandison's assessment report made five recommendations for Student: (1)

16   use of a Lindamood-Bell, Orton Gillingham/Slingerland approach to remediate her finding of

17   dyslexia; (2) a placement where Student would be taught according to grade level standards; (3) a

18   "seamlessly integrated social pragmatic program"; (4) an assistive technology assessment; and (5)

19   a placement at the STAR Academy in San Rafael.  (AR 1198.)  As previously discussed herein,

20   Vacaville thoroughly considered Dr. Grandison's findings in the June, October, and December

21   2010 IEP meetings as it was required by law to do.  *See* Cal. Educ. Code, § 56329, subd. (c)

22   (providing that a school district must "consider" an IEE paid for at public expense).  Furthermore,

23   the IEPs and meeting notes reflect that even before Vacaville learned of Dr. Grandison's findings,

24   it had been implementing placements and accommodations that mirrored virtually all of her

25   recommendations.  For example, during Student's fifth grade year, both Ms. Jones and Ms.

26   Bentley used the Michelle Winner Garcia technique of social cognition programming to address

27   social pragmatics.  Regarding Dr. Grandison's recommendation for intensive phonologically-

28   based multisensory intervention programs, Ms. Jones testified she used Lindamood-Bell

1   strategies with Student in addition to other intensive reading intervention strategies.  Ms. Steiert

2   testified she used a component of the Language! intervention reading program with Student to

3   address his deficits in phonics.  All of the teachers testified to regularly using assistive technology

4   with Student such as visual organizers for writing, keyboarding, and programs such as Kurzweil

5   and Read Naturally for reading.  Further, after learning of Dr. Grandison's findings, Vacaville

6   immediately offered extended school year (summer) services.

7          The only recommendation that Vacaville did not implement was the placement of

8   Student at the STAR Academy.  The Administrative Record supports the ALJ's finding that

9   Plaintiff failed to present evidence pertaining to how the services offered at STAR Academy

10  would benefit Student.  In contrast, there was significant evidence showing that Students round-

11  trip commute to and from STAR Academy would likely be detrimental to Student.  For example,

12  Ms. Kennedy Hunt credibly and persuasively testified that the lengthy commute (90 minutes each

13  way) would have negative effects on Student's focus and social pragmatics skills.  (Hr'g Tr.

14  145:15−146:3, Dec. 15, 2010.)  In addition, she testified that Student's lack of exposure to his

15  typically developing peers while at the STAR academy and the decreased time at home combined

16  with fewer opportunities to socialize with peers and engage in extracurricular activities would

17  adversely affect Student.  (Hr'g Tr. 145:15−146:3, Dec. 15, 2010.)

18         The evidence also indicates that STAR Academy was a more restrictive placement

19  with more "pull-out services" than the SDC at Sierra Vista.  At Sierra Vista, Student integrates

20  with regular education peers during music, band, P.E., recess, lunch, and assemblies.  Thus, the

21  Court agrees with the ALJ's finding that SDC was an appropriate placement for Student:

22              Vacaville's decision to not place Student at STAR was correct
                because the burden of Student spending fifteen hours per week on a
23              school bus in light of his many challenges, would require a
                concomitant showing of some tangible benefit.  There is no
24              meaningful evidence to support more benefit than harm was likely
                to occur.  Absent from the record is any testimony from anyone
25              officially associated with STAR Academy explaining why such a
                placement was needed for Student to receive meaningful
26              educational benefit.

27

28  (AR 291, finding 34.)  Moreover, the IDEA provides in 20 U.S.C. § 1412(a)(5)(A) that, "[t]o the

34

1    maximum extent appropriate, children with disabilities, including children in public or private

2    institutions or other care facilities, are educated with children who are not disabled;" and "special

3    classes, separate schooling, or other removal of children with disabilities from the regular

4    educational environment occurs only when the nature or severity of the disability of a child is

5    such that education in regular classes with the use of supplementary aids and services cannot be

6    achieved satisfactorily."  As such, the Court finds that the ALJ's finding is consistent with the

7    IDEA's requirement that children be provided a FAPE in the least restrictive environment.  *See*

8    20 U.S.C. § 1412(a)(5)(A); *see also Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d

9    1398, 1403 (1994) (implementing balancing test of four factors: (1) the educational benefits of

10   placement full-time in a less restrictive class; (2) the non-academic benefits of such a placement;

11   (3) the effect of the student on the teacher and children in the less restrictive class, and (4) the

12   costs of mainstreaming the student).  Thus, the Court finds that Plaintiff's contention lacks merit.

### iii.  Plaintiff's Contention that Vacaville Failed to Change Student's Program to Address a Lack of Progress

15          Plaintiff contends that Student failed to progress and that Vacaville's knowledge of

16   the lack of progress required Vacaville to convene an IEP meeting to discuss Student's program,

17   pursuant to California Education Code § 56343(b).  (ECF No. 54 at 25.)  Specifically, Plaintiff

18   alleges that from October 2008 to October 2010, Student remained at least two years below grade

19   level in his reading skills and made little or no progress.   (ECF No. 54 at 25.)  As stated in

20   Plaintiff's Opening Brief, "Plaintiff does not contest that Student made five months' growth in

21   five months' time in one area of reading," but stated that the progress was due to Ms. Jones, who

22   had provided Lindamood-Bell to Student and that the services were discontinued when Student

23   entered the Special Day Class in January 2010."  (ECF No. 54 at 27.)

24          IEPs are evaluated based on the information available when they are created and,

25   on what was objectively reasonable at that time.  *Roland M.*, 910 F.2d at 992.  While a student's

26   progress under an IEP can signal efficacy, a lack of progress is not an indication of an IEP's

27   adequacy.  *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008).

28   Thus, an essential inquiry is whether the IEPs are crafted to provide meaningful educational

1  benefit.  *See N.B. v. Hellgate Elementary School Dist*,. 541 F.3d 1202, 1212−1213 (9th Cir.

2  2007).  Meaningful educational benefit means a "basic floor of opportunity."  *Id.* at 1213.

3         Test scores are only one metric by which to assess progress.  Another metric, one

4  with particular significance in the IEP process, is a student's progress on goals.  IEP meeting

5  notes, the IEPs, and teacher testimony established that Student continued to make progress on his

6  reading goals.  Ms. Jones testified that Student made five months' progress, in five months, on

7  reading decoding. (Hr'g Tr. 37:1−12, Nov. 30, 2010.)  By Student's 2010 annual review,

8  Student's verbal assessments showed he could speak simple sentences that were grammatically

9  correct 100 percent of the time; he was able to resolve ambiguities in sentences with 90 percent

10  accuracy; and he was able to answer who, what, when, and where questions with 83 percent

11  accuracy.  This progress was largely attributable to the reading interventions and accommodations

12  provided Student throughout his time in Vacaville.  This combination of education and services

13  was intended to, and did, provide Student meaningful educational benefit. Therefore, the Court

14  agrees with the ALJ's finding that Vacaville's IEPs complied with the requirements set forth in

15  the IDEA because they were reasonably constructed based on the test scores and information

16  known to the team members at the time of inception.

17  **V.      CONCLUSION**

18         For the foregoing reasons, the Court finds that the ALJ's decision is substantially

19  supported by the administrative record and thus **AFFIRMS** the ALJ's decision.

20

21  DATED: September 17, 2013

22

23

24  Troy L. Nunley
    United States District Judge

25

26

27

28

36